Andrew M. Stein, SBN 82963
Joseph A. Markus, SBN 113802
**LAW OFFICES OF STEIN AND MARKUS, PLC**
9944 Flower Street
Bellflower, CA 90706
Telephone: (562) 866-9762
Email: astein.steinandmarkus@gmail.com
Email: jmarkus.steinandmarkus@gmail.com

Gregory Peacock, Esq. (SBN. 277669)
**GREG PEACOCK LAW**
4425 Jamboree Road, Suite 130
Newport Beach, CA 92660
Telephone: (949) 292-7478 Email: gregorypeacockesq@gmail.com

Attorneys for Plaintiff Samuel Bonner

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL BONNER,<br><br>    Plaintiff,<br><br>    vs.<br><br>CITY OF LONG BEACH; COUNTY OF LOS ANGELES; WILLIAM COLLETTE; ESTATE OF WILLIAM COLLETT; JOHN HENRY MILLER; ESTATE OF JOHN HENRY MILLER; CONNIE COLLETTE, as successor in interest to WILLIAM COLLETTE; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.: 2:22-cv-02819-CAS-MAA<br><br>SECOND AMENDED COMPLAINT FOR DAMAGES FOR:<br><br>1. Deprivation of Civil Rights, 42 U.S.C. 42 § 1983, Deprivation of Due Process of Law and Violation of Right to Fair Trial;<br>2. Deprivation of Civil Rights, 42 U.S.C. 42 § 1983, Conspiracy Claim;<br>3. Deprivation Of Civil Rights, 42 U.S.C. 42 § 1983, *Brady, Garcia,* And *Moody* For Failure To Disclose Material Exculpatory Evidence;<br>4. Deprivation of Civil Rights, 42 U.S.C. § 1983 Claim For Post-Trial Suppression Of Exculpatory Evidence |

SECOND AMENDED COMPLAINT FOR DAMAGES

5.  Deprivation of Civil Rights, 42 U.S.C. 42 § 1983, Supervisorial Liability;
6.  Deprivation of Civil Rights, 42 U.S.C. 42 § 1983, Deliberate Fabrication of Evidence;
7.  Municipal Liability (*Monell* Liability) For Custom / Practice / Policy and Failure to Train;
8.  California Code § 815.2 Claim for Respondeat Superior and Vicarious Liability Including for Negligent Supervision and Training;
9.  California Code § 835.4.
10. Negligence (California Law.)

**JURY TRIAL DEMANDED**

    **COMES NOW** Plaintiff Samuel Bonner and shows this honorable court the following:

<u>**JURISDICTIONAL ALLEGATIONS**</u>

    1.    As this action is brought under 42 U.S.C. § 1983, this court has jurisdiction over this case under its federal question jurisdiction pursuant to 28 U.S.C. § 1331.

    2.    As the incidents complained of in this action occurred in the County of Los Angeles, State of California, within the territorial jurisdiction of this court, venue properly lies in this court pursuant to 28 U.S.C. § 1391(b)(2).

SECOND AMENDED COMPLAINT FOR DAMAGES

3.      As Plaintiff's claims brought under California state law arise out of the same transactions and occurrences, and out of a common nucleus of operative facts as the Plaintiff's federal question claims, this court has jurisdiction over the Plaintiff's California State law claims under its supplemental jurisdiction under 28 U.S.C. § 1367, and otherwise pursuant to *Mine Workers v. Gibbs*.

4.      Plaintiff has complied with the California Government Tort Claims requirements.

## **GENERAL ALLEGATIONS**

5.      Plaintiff Samuel Bonner, hereinafter referred to as "BONNER" or "Plaintiff BONNER", is a natural person, who, at all times complained of in this action, resided in the County of Los Angeles, State of California.

6.      Defendant County of Los Angeles, hereinafter also referred to as "COUNTY", is a municipal entity located in the State of California; within the territorial jurisdiction of this court. The Los Angeles District Attorney's Office and Los Angeles County Sheriff's Department is, and at all times herein alleged was, an agency of COUNTY.

7.      Defendant City of Long Beach, hereinafter also referred to as "CITY", is a municipal entity located in the State of California; within the territorial jurisdiction of this court. The Long Beach Police Department is, and at all times herein alleged was, an agency of CITY.

SECOND AMENDED COMPLAINT FOR DAMAGES

8.     William Collette, hereinafter also referred to as "COLLETTE" is and at all times complained of herein, was, a peace officer, a police officer, employed by the Long Beach Police Department, acting as an individual person under the color of state law, in his individual capacity and was acting in the course of and within the scope of his employment with defendant CITY. Based upon information and belief, COLLETTE is now deceased. Plaintiff brings also brings this action against the Estate of William Collette. At all times complained of herein, COLLETTE was acting within the course and scope of his employment with the City of Long Beach. Accordingly, the City of Long Beach will indemnify the Estate of William Collette for any judgment obtained against the estate.

9.     Connie Collette is the surviving spouse of Decedent William Collette. Accordingly, Connie Collette is the successor in interest to Decedent William Collette, and any action, judgment and/or debt may be brought / enforced against Connie Collette in the same manner as they could have been brought / enforced against Decedent William Collette if Decedent William Collette had not died. (Cal. Probate Code § 13554.)

10.     John Henry Miller, hereinafter also referred to as "MILLER" is and at all times complained of herein, was, a peace officer, a police officer, employed by the Long Beach Police Department, acting as an individual person under the color of state law, in his individual capacity and was acting in the course of and within the scope of his employment with defendant CITY. Based upon information and

SECOND AMENDED COMPLAINT FOR DAMAGES

belief, MILLER is now deceased. At all times complained of herein, MILLER was acting within the course and scope of his employment with the City of Long Beach. Accordingly, the City of Long Beach will indemnify John Henry Mill for any judgment obtained against him and/or his successors in interest.

11.     Joseph Miller is the surviving son of Decedent John Henry Miller. Accordingly, John Henry Miller is a successor in interest to Decedent John Henry Miller, and any action, judgment and/or debt may be brought / enforced against Joseph Miller in the same manner as they could have been brought / enforced against Decedent John Henry Miller if Decedent John Henry Miller had not died. (Cal. Probate Code § 13554.)

12.     Helen Hyatt is the surviving daughter of Decedent John Henry Miller. Accordingly, Helen Hyatt is a successor in interest to Decedent John Henry Miller, and any action, judgment and/or debt may be brought / enforced against Helen Hyatt in the same manner as they could have been brought / enforced against Decedent John Henry Miller if Decedent John Henry Miller had not died. (Cal. Probate Code § 13554.)

13.     Defendants DOES 1 through 6, inclusive, are sworn peace officers and /or deputy district attorneys and / or deputy sheriffs and/or police officers and/or investigators and/or Special Officers and/or a dispatchers and/or some other public officer, public official or employee of defendant COUNTY and/or otherwise employed by the Los Angeles County Sheriff's Department and/or Los Angeles

SECOND AMENDED COMPLAINT FOR DAMAGES
5

County District Attorney's Office, and/or defendant CITY and/or otherwise employed by the Long Beach Police Department, or some other law enforcement agency, who in some way committed some or all of the tortious actions (and constitutional violations) complained of in this action, and/or are otherwise responsible for and liable to plaintiff for the acts complained of in this action, whose identities are, and remain unknown to plaintiff, who will amend his complaint to add and to show the actual names of said DOE defendants when ascertained by plaintiff.

14.    At all times complained of herein, DOES 1 through 6, inclusive, were acting as individual persons acting under the color of state law, pursuant to their authority as sworn peace officers and /or deputy district attorneys and/or deputy sheriffs and/or Special Officers and/or Supervisors (i.e. Sergeants, Lieutenants, Captains, Commanders, etc.) and/or dispatchers, employed by the Los Angeles County Sheriff's Department and/or Los Angeles County District Attorney's Office, and/or Long Beach Police Department, and/or some other law enforcement agency, and were acting in the course of and within the scope of their employment with defendant COUNTY and/or CITY and/or some other law enforcement agency.

15.    Defendants DOES 7 through 10, inclusive, are sworn peace officers and /or the district attorney and /or supervisory prosecutors and/or the Sheriff and/or Assistant Sheriffs and/or Commanders and/or Captains and/or Lieutenants

SECOND AMENDED COMPLAINT FOR DAMAGES

6

and/or Sergeants and/or other Supervisory personnel and/or policy making and/or final policy making officials, employed by Los Angeles County Sheriff's Department and/or defendant County of Los Angeles, and/or District Attorney and/or District Attorney Supervisor and/or District Attorney policymaker, employed by the Los Angeles County District Attorney's Office, and/or Chief of Police, Assistant Chiefs and/or Commanders and/or Captains or policymaker, employed by the Long Beach Police Department, who are in some substantial way liable and responsible for, or otherwise proximately caused and/or contributed to the occurrences complained of by plaintiff in this action, such as via supervisory liability (i.e. failure to properly supervise, improperly directing subordinate officers, approving actions of subordinate officers), via bystander liability (failing to intervene in and stop unlawful actions of their subordinates and/or other officers), and such as by creating and/or causing the creation of and/or contributing to the creation of the policies and/or practices and/or customs and/or usages of the Los Angeles County Sheriff's Department, and/or Los Angeles District Attorney's Office and/or Long Beach Police Department for, *inter alia*,: 1) failing to provide fair trials to criminal defendants; 2) policies violating *Brady v. Maryland*; 3) covering up tortious conduct by peace officers; 4) knowingly providing false testimony and evidence to obtain convictions; 5) failing to disclose information to defendants regarding informants; and 6) failing to maintain an index related to the use of jailhouse informants and benefits provided to jailhouse informants.

SECOND AMENDED COMPLAINT FOR DAMAGES

16.     At all times complained of herein, DOES 7 through 10, inclusive, were acting as individual persons acting under the color of state law, pursuant to their authority as Supervisory personnel and/or policy making and/or final policy making officials with the Los Angeles County Sheriff's Department, Los Angeles District Attorney's Office and/or some other public official(s) with defendant COUNTY and/or CITY and/or some other law enforcement agency, and were acting in the course of and within the scope of their employment with defendant COUNTY and/or CITY and/or some other law enforcement agency.

17.     At all times complained of herein, defendants DOES 7 through 10, inclusive, were acting as individual persons under the color of state law; under and pursuant to their status and authority as peace officers and/or Supervisory peace officers (as described herein, above and below), and/or policy making peace officers, and /or policy making employees with the Los Angeles County District Attorney's Office and/or otherwise with defendant COUNTY[1] and/or Long Beach Police Department and/or otherwise with defendant CITY.

18.     Plaintiff is presently unaware of the identities of DOES 1 through 10, inclusive, and will amend his complaint to add and to show the actual names of said DOE defendants, when made known to plaintiff.

---

[1] Such as a COUNTY and / or CITY executive officer.

SECOND AMENDED COMPLAINT FOR DAMAGES

19.     In addition to the above and foregoing, COLLETTE, MILLER and DOES 1 through 6, inclusive, acted pursuant to a conspiracy, agreement and understanding and common plan and scheme to deprive the plaintiff of his federal Constitutional and statutory rights, and California constitutional and statutory state law rights, as complained of in this action.

20.     COLLETTE, MILLER and DOES 1 through 6, inclusive, acted in joint and concerted action to so deprive the plaintiff of those rights as complained of herein; all in violation of 42 U.S.C. § 1983, and otherwise in violation of United States (Constitutional and statutory) law and California (Constitutional and statutory) state law.

21.     Said conspiracy / agreement / understanding / plan / scheme / joint action / concerted action, above-referenced, was a proximate cause of the violation of the plaintiff's federal and state constitutional and statutory rights, as complained of herein.

### FIRST CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983
**42 U.S.C. § 1983 CLAIM FOR**
**DEPRIVATION OF DUE PROCESS OF LAW AND VIOLATION**
**OF RIGHT TO A FAIR TRIAL UNDER THE FOURTEENTH**
**AMENDMENT**

22. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

SECOND AMENDED COMPLAINT FOR DAMAGES

9

23.   On November 11, 1982 Samuel Bonner was asked by Watson Allison to give Allison a ride from central Long Beach to the Rose Park area to meet with a man named Leonard Polk[2]. Mr. Bonner agreed.

24.   While Mr. Bonner and Allison were on their way to Polk's residence, undercover Long Beach Police Officer Edward Davenport reported that he noticed Mr. Bonner's car (a gray Ford) smoking. According to Davenport, he decided to follow the vehicle, and when he found the vehicle again at the intersection of 10th and Orizaba, there was a person leaning up against the car. The man was later identified as Leonard Polk. Officer Davenport observed Leonard Polk speaking with Allison at the passenger side window.

25.   Officer Davenport then observed Allison exit the vehicle and walk with Polk into Polk's apartment.

26.   Mr. Bonner did not exit the vehicle and drove away.

27.   Two other residents of Polk's apartment building, Ray Johnson and Frank Aguayo, observed the same interaction. Davenport testified that he saw Mr. Bonner drop Allison at the intersection, and then saw Allison and Polk enter Polk's apartment building. After Mr. Bonner drove off, he viewed Mr. Bonner make a u-turn a few blocks away and drive back down the street towards the apartment

_____

[2] It is alleged that Allison and Polk had planned to meet and engage in sexual activity.

SECOND AMENDED COMPLAINT FOR DAMAGES

10

building. As Mr. Bonner, continued past the apartment, Davenport noted the car's license plate.

28.     Neither Officer Davenport, or the neighbors observed Mr. Bonner or his vehicle return to the apartment building.

29.     About ten to fifteen minutes later, Davenport observed Watson Allison exit the apartment building carrying what appeared to be a duffle bag and put it in a white car later identified as belonging to Leonard Polk.

30.     Eyewitness Ray Johnson observed the same activity and watched Watson Allison coming out of Polk's apartment carrying a television set. After seeing Allison place the television set in Polk's car, Johnson watched as Allison made approximately three trips between Polk's apartment and car, carrying property away each time.

31.     All three witnesses (Johnson, Aguayo, and Davenport) then observed Watson Allison drive off, by himself, in Polk's white Toyota and leave the area.

32.     None of the witnesses observed Mr. Bonner going into the apartment; coming out of the apartment; or even being anywhere near the apartment building after he dropped Allison off.

33.     For unexplained reasons, Officer Davenport, who worked burglary suppression, did not follow nor attempt to detain Watson Allison, who he alleged to have observed being engaged in suspicious activity and making several trips removing Polk's property from the apartment building.

SECOND AMENDED COMPLAINT FOR DAMAGES

34.     Neighbors Johnson and Aguayo then entered Leonard Polk's apartment and found that Polk had been shot and killed.

35.     Long Beach Police Department Detective William Collette ("COLLETTE") arrived on the scene of Polk's apartment with his partner, Police Detective John Henry Miller ("MILLER"), at approximately 2:40 p.m.

36.     COLLETTE and MILLER found Polk's dead body on its back between a bean bag chair and a shattered glass coffee table.

37.     Polk was pronounced dead from gunshot wounds.

38.     Mr. Bonner and Watson Allison were later identified as suspects and subsequently arrested and charged with the robbery and murder of Leonard Polk.

39.     Officers subsequently searched Mr. Bonner, his vehicle and home. Officers did not find Polk's property on Mr. Bonner's person, in his vehicle or in his home. In Mr. Bonner's vehicle, officers located an envelope addressed to Allison with the notation "10th & Orizaba" in Allison's handwriting on the outside of the envelope.

40.     At a December 20, 1983, joint preliminary hearing, COLLETTE was called to testify and asked on direct examination if the registered owner of the 1964 gray Ford was discovered. COLLETTE testified that the vehicle was registered to a "Robert Collins." When later asked how Mr. Bonner was identified as a suspect in the Polk crimes and what probable cause they had to arrest Mr. Bonner, Detective COLLETTE testified that they had received information that a

SECOND AMENDED COMPLAINT FOR DAMAGES

12

car belonging to Mr. Bonner had been at the scene of the murder. COLLETTE was then asked:

> "Q      All right, sir. Did you, personally, run the license plate to determine the potential owner or user of the vehicle?
>
> A      I did.
>
> Q      Did that lead you to Mr. Bonner as a suspect?
>
> A      It did."

41.      Again, COLLETTE falsely testified at Mr. Bonner's preliminary hearing when asked what led him to identifying Mr. Bonner as a suspect in the case. Detective COLLETTE testified that, after he had personally run the license plate provided to him by Officer Davenport, the car came back as "belonging to him", identifying Mr. Bonner - this after having already testified that the car's registered owner was a man named Robert Collins.

42.      Based on this testimony, and the impossibility of Detective COLLETTE identifying Mr. Bonner as a suspect by his personal running of the license plate (as he had already testified that the car was registered to Robert Collins), Mr. Bonner's trial counsel moved the court for a dismissal of the charge against Mr. Bonner on the grounds of insufficient evidence, arguing that it is not enough to know someone or to give them a ride, to prove charges of murder and robbery.

SECOND AMENDED COMPLAINT FOR DAMAGES

13

43.    The court agreed, stating, "It is unfortunate, but I have to agree with Mr. Kandel on that." Facing the prospect of the case being dismissed for lack of evidence, prosecutor Kurt Seifert requested he be allowed to reopen the case - a request the court granted.

44.    Detective COLLETTE was recalled as a witness in a desperate attempt to prevent the case from being dismissed. Despite having not previously testifying to what would have been highly relevant evidence, and without being able to identify the specific questions asked, alleged that Mr. Bonner had denied giving Watson Allison a ride or being at 10th and Orizaba on the day of the murder and denied knowing Allison's name. Everything that COLLETTE testified to was knowingly false. Mr. Bonner has spent decades insisting that COLLETTE's testimony was patently false.

45.    Based solely on this additional perjured testimony of Detective COLLETTE, Mr. Bonner was held to answer on the charges. But for Detective COLLETTE's false testimony, the case against Mr. Bonner would have been dismissed.

46.    The case proceeded to trial. Detectives COLLETTE and MILLER and Prosecutor Seifert introduced to the case a jailhouse informant named "Michael Hayes" (whose real name is actually Charles Jones.)

47.    "Mr. Hayes" had been coached by MILLER and COLLETTE to provide untruthful statements at Mr. Bonner's trial. Specifically related to Mr.

SECOND AMENDED COMPLAINT FOR DAMAGES

14

Bonner allegedly confessing to "Mr. Hayes" that he committed the murder, along with his criminal history and benefits received for testifying at trial.

48.    Mr. Bonner was tried along with alleged co-Defendant Watson Allison for the apartment robbery and murder of Leonard Polk.

49.    Prosecutor Kurt Seifert argued in separate trials that Mr. Bonner and Watson Allison were acquaintances who killed Leonard Polk. Though witnesses saw Allison enter Polk's apartment and make several trips in and out with stolen property, no one saw Mr. Bonner go inside. As such, prosecutor Kurt Seifert relied on evidence, and on a theory of the case, he *knew* to be false: the perjured testimony of prolific jailhouse informant Michael Hayes (Charles Jones.)

50.    Prior to the start of Mr. Bonner's trial, Seifert informed the defense that a new witness, a county jail inmate named "Michael Hayes" (Charles Jones), had surfaced. "Mr. Hayes" claimed that, while he and Mr. Bonner were in county jail together awaiting trial, Mr. Bonner confessed to him that he entered Polk's apartment and shot Polk.

51.    "Mr. Hayes" faced his own pending charges – two homicide prosecutions, one of which involved special circumstances. On December 31, 1982, "Mr. Hayes" had been arrested by Los Angeles Police Department Detective Woodrow Parks and charged with first degree murder, with special circumstances. "Mr. Hayes" was accused of burglarizing a house to obtain drugs. When

SECOND AMENDED COMPLAINT FOR DAMAGES

15

confronted by the occupant, he allegedly fired his gun, a .38 caliber revolver resulting in the occupant's death.

52.    "Michael Hayes" (Charles Jones) had also been arrested on a second murder case involving a co-defendant Gregory Breazeale (the "Breazeale case"). In that case, "Mr. Hayes" was accused of accompanying Mr. Breazeale and several other individuals to purchase drugs. The suspected seller was killed. The murder weapon was also a .38 caliber revolver. "Mr. Hayes" alone claimed to have seen the murder.

53.    In approximately February of 1983, and while "Mr. Hayes" was in custody for a murder charge, Detective Parks engaged in a thirty to forty-five minute conversation with "Mr. Hayes" about the Bonner case. Despite the fact that this conversation involved a pending homicide case, Detective Parks, an experienced detective, took no notes of the conversation and did not record it.

54.    Following his meeting with Detective Parks, in February 1983, "Mr. Hayes" told Detective Parks that both Mr. Bonner and Anthony Stacy, another defendant in a separate pending homicide case, had both confessed to him that they had committed murders. After "Mr. Hayes" provided information in the Bonner, Breazeale, and Stacy cases, his special circumstances case was reduced to manslaughter, and he received only a four-year sentence.

SECOND AMENDED COMPLAINT FOR DAMAGES

55.     Prosecutor Kurt Seifert chose to have "Michael Hayes" testify at Mr. Bonner's trial and to testify that Mr. Bonner had confessed to him while they were in jail together that he shot and killed Mr. Polk.

56.     Despite knowing "Hayes" was lying, prosecutor Kurt Seifert, with the assistance of Detectives COLLETTE and MILLER, sought the death penalty against Mr. Bonner based on "Mr. Hayes'" perjured testimony.

57.     Based on this testimony, Mr. Bonner was convicted of first-degree murder and special circumstances.

58.     "Mr. Hayes'" true name, complete rap sheet and benefits provided for testifying were never disclosed to Mr. Bonner or his counsel. To the contrary, COLLETTE, MILLER and Seifert knowingly allowed "Mr. Hayes" to lie about his name, convictions and benefits on the stand. Again, this was not disclosed to Mr. Bonner or his counsel.

59.     The trials of Mr. Bonner and Watson Allison involved inconsistency by omission: prosecutor Kurt Seifert created a different evidentiary record in the second trial of Watson Allison by failing to introduce evidence used in the first trial of Mr. Bonner. Specifically, Seifert argued at Mr. Bonner's trial that both Mr. Bonner and Allison had entered the victim's apartment together and that Mr. Bonner had been the one to shoot the victim.

60.     In proceeding to a second trial against Watson Allison, Seifert argued that Allison was the actual killer, and that Mr. Bonner was nothing more than a

SECOND AMENDED COMPLAINT FOR DAMAGES

17

wheelman who never entered the victim's apartment. Seifert argued that the only person who entered Polk's apartment was Allison.

61.   At Allison's trial, Seifert not only failed to call jailhouse informant "Michael Hayes" to testify, but he repeatedly ridiculed Allison's defense that Mr. Bonner was the actual killer.

62.   One of the reasons Seifert chose not to call "Mr. Hayes" to testify at Allison's trial, was that Seifert knew that "Mr. Hayes" was not truthful in Mr. Bonner's trial. Again, Seifert did not disclose that he knew that "Mr. Hayes" had lied during the trial to Mr. Bonner or his counsel.

63.   Watson Allison was convicted of murdering Leonard Polk and was sentenced to death.

64.   Mr. Bonner was sentenced to 25 years to life in prison.

65.   In a 2008 deposition regarding Watson Allison's death penalty appeal in federal court, Kurt Seifert claimed that, after he heard the .357 Magnum answer (i.e., that "Michael Hayes" alleged that Mr. Bonner told him he used a .357 Magnum to shoot and kill the victim), Seifert concluded that Hayes had lied on the witness stand against Mr. Bonner. Seifert went on to declare that "Michael Hayes'" statements "were lies" and said that this was the reason he did not call "Michael Hayes" to testify at Watson Allison's trial.

66.    The problem with Seifert's deposition is that Seifert never informed Mr. Bonner's counsel nor the trial court that he had concluded that "Michael Hayes" had lied on the witness stand against Mr. Bonner.

67.    MILLER was also deposed and testified that he and COLLETTE did not believe that Mr. Bonner ever entered the apartment and believed that Mr. Bonner had no involvement in the murder. This information was never relayed to the district attorney's office, Mr. Bonner or Mr. Bonner's counsel.

68.    To the contrary, after "Michael Hayes" testified, Seifert called detective COLLETTE *back* to the witness stand to corroborate "Michael Hayes'" testimony - testimony Seifert had already concluded was false. COLLETTE took the stand and once again knowingly testified untruthfully in yet another desperate attempt to convict Mr. Bonner.

69.    In ultimately granting Watson Allison federal habeas corpus relief by way of reversing the special circumstance allegation against him, United States District Judge Christina A. Snyder found Seifert, COLLETTE, and MILLER's willingness to obtain the death penalty against BONNER based on the foregoing facts egregious and shocking.

70.    In July 2019, based on recent changes to California homicide law, and after decades of proclaiming his innocence and seeking relief from his wrongful conviction (efforts that were repeatedly denied despite the State's knowledge that "Michael Hayes" was a serial liar whose real name was Charles Jones), Mr. Bonner

SECOND AMENDED COMPLAINT FOR DAMAGES

appeared in the Los Angeles County Superior Court for the purpose of sentence review under newly-enacted Penal Code § 1170.95.

71.    After numerous delays by the People in responding, and following a thorough review of the entirety of the history of Mr. Bonner's case, the court catalogued the numerous inconsistencies in "Michael Hayes'" testimony at BONNER's trial starting with the infamous jailhouse informant's own name, which is not Michael Hayes, but Charles Jones.

72.    The court found everything else about "Michael Hayes" to also be a lie, concisely going through each and every part of "Michael Hayes'" testimony against Mr. Bonner that was found to be either erroneous or completely fabricated, finding Seifert, COLLETTE, and MILLER's depositions in Watson Allison's federal case shocking to the conscience and chastising Seifert for admitting in his deposition that he had known "Michael Hayes" was lying when he testified about the wrong gun, but used the testimony anyway.

73.    The Court further found the County's failure to provide Michael Hayes / Charles Jones' full rap sheet to Mr. Bonner constituted a *Brady* violation as well as the prosecutor's failure to inform Mr. Bonner or his counsel of the fact that Hayes / Jones had perjured himself.

74.    Based on these facts, the trial court vacated not only Mr. Bonner's murder conviction, but the robbery conviction as well, finding that "egregious prosecutorial misconduct severely violated defendant's due process rights by

SECOND AMENDED COMPLAINT FOR DAMAGES

impacting the fairness of the trial." Judge Lowenthal of the California Superior Court then went on to find Mr. Bonner factually innocent of committing the crimes.

75.    Los Angeles County Superior Court Judge Andrew Lowenthal held:

> *The gentleman's petition is granted. The conviction is vacated. I am not going to resentence him because of the **gross prosecutorial misconduct; the due process violations created by the prosecutor's presentation of inconsistent theories and his knowing presentation of perjured testimony** . . . Mr. Bonner is ordered released. He is not subject to parole supervision. He's ordered released today. That's all.*

76.    At the July 8, 2019, Penal Code § 1170.95 hearing regarding Mr. Bonner's eligibility for resentencing and longstanding claim of innocence, the trial court, recognizing the pattern of the Los Angeles County District Attorney offices' use of jailhouse informant Michael Hayes (Charles Jones) to convict numerous men of first degree murder. None of this information was provided to Mr. Bonner or his counsel.

77.    The Los Angeles County District Attorney's Office appealed Judge Lowenthal's finding of factual innocence. On April 7, 2021, the Los Angeles County District Attorney's Office requested the dismissal of their appeal of the finding of factual innocence and the appeal was dismissed.

78.    As a result of the gross misconduct described above, Mr. Bonner spent nearly 37 years of his life incarcerated.

79.     The Court took judicial notice of not only the entirety of the Bonner and Allison state and federal court files, but also judicial notice of Los Angeles County Superior Court Case A373230, *People v Stacy*.

80.     In 1983, Anthony Stacy, like Mr. Bonner, was housed in the Los Angeles County jail awaiting trial for murder. At Stacy's murder trial, as it did in Mr. Bonner's case, the prosecutor introduced the testimony of jailhouse informant "Michael Hayes" (Charles Jones), who alleged in both cases that Stacy and Mr. Bonner had confessed to him that they had committed murder. Based almost entirely on this evidence, both Stacy and Mr. Bonner were convicted of murder.

81.     After the trials at which both Mr. Bonner and Stacy were convicted based on the testimony of "Michael Hayes" (Charles Jones), information surfaced in the media concerning the improper use of jailhouse informants by the Los Angeles District Attorney's Office, this at the same time Mr. Bonner's state habeas corpus petition was pending.

82.     The 1989-1990 Los Angeles County Grand Jury studied the use of jailhouse informants by the Los Angeles District Attorney's Office in the late 1970s through the 1980s, resulting in a report describing abuses in the use of such informants. Among other things, the Grand Jury concluded that jailhouse informants manufactured confessions to obtain sentencing benefits, sometimes conferred after the fact and not disclosed to the defense. The Grand Jury specifically stated that "the Los Angeles County District Attorney's Office failed in

SECOND AMENDED COMPLAINT FOR DAMAGES

22

its responsibilities by its 'deliberate and informed declination to take the action necessary to curtail the misuse of jailhouse informant testimony.'" The Grand Jury also concluded that informants would often disclaim any interest in consideration and would falsely claim to have been motivated by a sense of justice. The Grand Jury described the typical jailhouse informant involved in such misconduct as having an extensive, almost continuous listing of arrests and convictions, and facing serious charges.

83.     Based in part on this report, in November 1995, Mr. Stacy's counsel located "Michael Hayes" (Charles Jones) incarcerated at Marion Adjustment Center in Marion, Kentucky, minimum security prison, under the name of Michael Hayes. On January 19, 1996, Mr. Stacy's counsel and his investigator traveled to Kentucky to interview Michael Hayes (Charles Jones). Shortly before the interview, the warden informed Mr. Stacy's counsel that the Kentucky computer system did not contain any reference to Mr. Hayes' two homicide arrests or to his manslaughter conviction. Counsel subsequently learned that "Mr. Hayes'" record had been sanitized, facilitating his placement at the minimum-security prison.

84.     "Mr. Hayes" spoke to Mr. Stacy's counsel and acknowledged he had testified falsely at Mr. Stacy's trial. "Mr. Hayes" stated his purpose in contacting Detective Parks was actually not to see that justice was done, but to attempt to reduce the four years he faced on his pending murder charge to *straight probation*.

"Mr. Hayes" then terminated the interview and stated he had told Mr. Stacy's counsel too much already.

85.    Mr. Stacy's counsel also obtained a District Attorney special circumstances memorandum which stated that one of the reasons for reducing Mr. Hayes' special circumstances charge to manslaughter was his providing information in cases prosecuted by the Los Angeles County District Attorney's Office.

86.    In May, 1996, Mr. Stacy filed a petition for writ of habeas corpus and accompanying memorandum, describing "Mr. Hayes'" statements to Mr. Stacy's counsel, alleging "Mr. Hayes" had testified falsely in Mr. Stacy's case and asserting "Mr. Hayes" had received consideration not disclosed to Mr. Stacy's trial counsel. Mr. Stacy also alleged "Mr. Hayes'" record had been sanitized, enabling him to be housed in the minimum security prison in Kentucky, and that records of "Mr. Hayes'" two homicide arrests and his manslaughter conviction were not transmitted to Kentucky authorities.

87.    During this process, Mr. Stacy's counsel was provided "Mr. Hayes'" rap sheet. As Mr. Stacy's counsel pointed out, the rap sheets produced contained over 15 entries reflecting approximately 30 arrests and convictions not disclosed to Mr. Stacy's trial counsel. The rap sheets given to trial counsel did not include, among other things, convictions of five prior felonies and arrests and/or convictions for receiving stolen property, robbery in the first degree, murder, theft,

SECOND AMENDED COMPLAINT FOR DAMAGES

24

possession of a handgun by a convicted felon, burglary, obtaining narcotics by fraud and deceit, wanton endangerment conspiracy, and other offenses.

88.     Since the eight-year "revolving door" history of arrests and convictions raised the suspicion that "Mr. Hayes" had worked as an informant, in November 1997, Mr. Stacy's counsel again traveled to Kentucky and, using the rap sheets, interviewed individuals, obtained additional records, and learned additional information. Mr. Stacy's counsel learned that, for years prior to testifying in Mr. Stacy's case, "Mr. Hayes" had worked as an informant for the Louisville Police Department and repeatedly received cash and leniency as "payment" for the information he supplied. The informant relationship was terminated by Kentucky police in 1978, because of "Mr. Hayes'" dishonesty. The records also demonstrated that "Mr. Hayes" had committed acts of dishonesty, including falsifying reports, lying to his probation officer and for lying under oath regarding jailhouse confessions.

89.     Since the time of Mr. Bonner's trial and conviction, the conduct of the same trio of prosecutors and police detectives that suborned perjury and elicited false testimony at Mr. Bonner's trial have been the subject of numerous published and unpublished court decisions.

90.     In the over three decades since the Los Angeles Grand Jury's report detailing the abuses Committed by Los Angeles County law enforcement officials in using jailhouse informants as a mean by which to convict defendants, the

SECOND AMENDED COMPLAINT FOR DAMAGES

25

conduct of prosecutor Kurt Seifert, working in conjunction with Detectives

COLLETTE and MILLER, have been the subject of numerous published and

unpublished appellate opinions condemning the conduct of these officials,

reversing cases in which these officials provided either misleading or outright false

information. (See, e.g., *People v Morris* (1988) 46 Cal.3d 1; *In Re Jackson* (1992)

3 Cal.4th 578; *People v Wilson* (2005) 36 Cal.4th 306; *People v Jones* (2017) 3

Cal.5th 583, and *In re Stacy* [CA2/4, Bl43115, Jun. 10, 2002.].) The case of *People*

*of the State of California vs. Oscar Morris* best describes the type of misconduct

and false testimony provided at Mr. Bonner's preliminary, trial court, and

postconviction proceedings.

91.     In *Morris,* the Defendant alleged his conviction must be reversed

because of due process violations stemming from the district attorney's failure to

disclose evidence bearing on the credibility of the prosecution's key witness, Joe

West, and in that Detective COLLETTE provided knowingly false testimony when

he stated Joe West had been provided no offer of leniency in exchange for his

testimony. COLLETTE claimed that West's motive for cooperating with the

prosecution was a quarrel with Oscar Morris which resulted in his attempt on

Morris' life, and the alleged subsequent shooting of his friend, Bruce Thompson.

92.     As its final witness, the prosecution called COLLETTE, the Long

Beach police detective in charge of the murder investigation at issue. The

SECOND AMENDED COMPLAINT FOR DAMAGES

26

prosecutor concluded his direct examination of Detective COLLETTE with the following question:

> Prosecutor:   At the time that you talked to Mr. West and the time that he gave you the information about this case, did he ask you for any favor or remuneration or payment in either cash or in kind?
>
> COLLETTE:   He did not.
>
> Prosecutor:   Did he ever?
>
> COLLETTE:   No, sir.

93.   On cross-examination, Detective COLLETTE acknowledged that West was in custody in the Los Angeles County jail when he first contacted the detective in June 1982, and that sometime thereafter be was released from jail. In his closing argument, the prosecutor returned to the subject of West's motive for testifying against defendant, reminding the jury that defendant had "killed [West's] friend," Bruce Thompson. Defense counsel, in response, pointed out during closing argument that West had been in jail on felony charges when he "miraculously" contacted the police and thereafter had received a lenient sentence. During rebuttal argument, however, the prosecutor emphatically refuted the implication that West had received any consideration from the prosecution in return for his testimony, stating as follows: "[Defense counsel] implies or certainly asks you all to infer that Mr. West is getting something for his testimony here ... *And there is no evidence,*

SECOND AMENDED COMPLAINT FOR DAMAGES

27

*not a shred, and you would have it if it existed, if Mr. West got any benefit from*

*this case, that is, in the handling of his criminal case."*

94.     This statement made by the deputy district attorney to defendant's
jury was completely false.

95.     In reviewing Morris' case, the Court found that it was undisputed that
letters drafted by Detective MILLER and the deputy district attorney resulted in
the parole board's decision to terminate the state prison sentence which it had
previously imposed as a result of West's parole violation. and that neither letter
was disclosed to Morris for use at trial. The court went on to find that the
prosecution's failure to disclose its efforts on West's behalf constituted a violation
of due process, and that COLLETTE's testimony was misleading, at best, as both
Detective COLLETTE's letter of August 6th and the deputy district attorney's
letter of October 8th expressly recommended that West be rewarded with a lenient
disposition of pending felony charges in return for his cooperation in the Maxwell
murder investigation and his testimony at the preliminary hearing.

96.     Both letters were introduced at West's sentencing hearing and proved
to be instrumental in West's receiving a time-served disposition. Yet neither letter
were ever made available to defense counsel for use as impeachment evidence at
trial. Thus, the court held that the evidence left no room for doubt that defendant
was wrongfully deprived of material evidence bearing on the credibility of the
prosecution's key witness, Joe West.

SECOND AMENDED COMPLAINT FOR DAMAGES

97.     In *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013), the Long Beach Police Department Detectives COLLETTE and MILLER were again found to have violated the Plaintiff's right to a fair trial in their unlawful use of jailhouse informants and *Brady* violations. The COUNTY of Los Angeles was also found to have mismanaged their administrative policies related to the use of jail informants which deprived criminal defendants of their right to a fair trial.

98.     In *Goldstein*, an ex-Marine and decorated Vietnam veteran, also involved Long Beach Detectives COLLETTE and MILLER, and the knowing use of perjured testimony, i.e., use of notorious jailhouse informant Edward Fink, who later testified that COLLETTE and MILLER coached him to identify Goldstein as the perpetrator of the crime. Just as in the many other cases involving the Los Angeles County District Attorney's Office and COLLETTE and MILLER, jailhouse informant disclosures were not properly made along with other *Brady* violations related to the use of jailhouse informants.

99.     From 1989 to 1997, Mr. Bonner filed seven state law petitions for a writ of habeas corpus. His first petition claimed that "Mr. Hayes'" testimony was perjured. The responded that there was "not a shred of evidence" that "Mr. Hayes" had lied. All of petitions were denied.

100.   No one from CITY or COUNTY, including Seifert, COLLETTE and MILLER provided the Brady information to Mr. Bonner or his counsel during his post-conviction petitions.

SECOND AMENDED COMPLAINT FOR DAMAGES

29

101.   As a result of defendants' conduct, Mr. Bonner spent nearly 37 years in prison for a crime that he did not commit – the second longest confirmed wrongful conviction in the State of California.

102.   The actions of COLLETTE; MILLER; and DOES 1 through 6, inclusive, as complained above herein, constituted a violation of BONNER's rights under the Fourth and Eighth Amendments to the United States Constitution to be free from the use of unlawful and unreasonable and excessive force upon his person.

103.   As a direct and proximate result of the actions of Defendants, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 CIVIL
### RIGHTS CONSPIRACY CLAIM

104. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

105. Defendants and other not named herein, agreed among themselves to act in concert to deprive Mr. Bonner of his clearly established constitutional rights

SECOND AMENDED COMPLAINT FOR DAMAGES

as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right to be free from illegal seizure.

106. As described above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, to frame Mr. Bonner for a crime that he did not commit, including but not limited to using knowingly false testimony to convict him and failing to provide *Brady* information to Mr. Bonner or his counsel.

107. As a direct and proximate result of Defendants' overt acts, Mr. Bonner was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for nearly 37 years; and subjected to other grievous injuries and damages set forth above.

108.   As a direct and proximate result of the actions of Defendants, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 CLAIM
### PURSUANT TO *BRADY, GARCIA*, AND *MOODY* FOR FAILURE TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE

109. Plaintiff realleges all the foregoing and any subsequent paragraphs

SECOND AMENDED COMPLAINT FOR DAMAGES

31

contained in the complaint, as if fully set forth herein.

110. Defendants, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to material exculpatory evidence and information as required *by Brady v. Maryland*, 373 U.S. 83 (1963) (hereafter *Brady* information), *People v. Garcia,* 17 Cal. App. 4th 1169 (1992) (hereafter *Garcia* information), and *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) (hereafter *Moody* information).

111. Pursuant to *Brady, Garcia*, and *Moody*, Defendants failed to disclose exculpatory evidence to the prosecutors handling Mr. Bonner's case and/or to turn over exculpatory evidence to Mr. Bonner's defense attorneys, the conviction court, the sentencing court, the court of appeals or post-conviction court so that it could be used to prove Mr. Bonner's innocence or secure his release from his wrongful imprisonment, including exculpatory evidence that was known at the time of trial and sentencing and new exculpatory evidence discovered after Mr. Bonner's wrongful conviction and the event of his sentencing.

112. The actions of each Defendant, acting individually and/or in concert, in withholding evidence were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

113. The constitutional source of the obligation to provide *Brady*, *Garcia*, and *Moody* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the

SECOND AMENDED COMPLAINT FOR DAMAGES

32

conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to such exculpatory information is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

114. Defendants were each jointly and severally responsible to provide *Brady, Garcia*, and *Moody* information to the prosecutors handling Mr. Bonner's case so that it could in turn be provided to Mr. Bonner's defense team. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

115. As a direct and proximate result of Defendants' conduct, Mr. Bonner was wrongly incarcerated for nearly 37 years and subjected to other grievous injuries during his time spent in prison.

116.   As a direct and proximate result of the actions of Defendants, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 CLAIM FOR
### POST-TRIAL SUPPRESSION OF EXCULPATORY EVIDENCE
### (Against COUNTY and DOES 1 through 6, inclusive)

117. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

118. Following Mr. Bonner's conviction, Defendants negligently or with reckless indifference withheld material exculpatory evidence, manufactured false reports about evidence in their possession, and misrepresented to the Court and to Mr. Bonner that any exculpatory physical evidence relating to his case had been destroyed and, further, the District Attorney's original file had been destroyed.

119. Mr. Bonner had a liberty interest in proving his innocence, including through newly discovered exculpatory evidence.

120. Defendants misconduct deprived Mr. Bonner of powerful evidence of innocence that he did not have until its belated disclosure. With that critical evidence, an earlier motion for post-conviction relief would have been successful and freed Mr. Bonner from prison.

121. Defendants' misconduct deprived Mr. Bonner of his liberty without due process of law and deprived Mr. Bonner access to the courts in violation of the Fourteenth Amendment to the United States Constitution.

SECOND AMENDED COMPLAINT FOR DAMAGES

122. As a direct result of Defendants' misconduct, Mr. Bonner's incarceration was wrongfully extended, and Mr. Bonner suffered physical, emotional, and pecuniary damages.

123.   As a direct and proximate result of the actions of Defendants, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

### FIFTH CAUSE OF ACTION
**42 U.S.C. § 1983 SUPERVISORY**
**LIABILITY CLAIM**
**(Against COUNTY, CITY and DOES 7 through 10, inclusive)**

124. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

125. Defendants COUNTY and CITY, knew, or in the exercise of reasonable care, should have known of a history and propensity and pattern at the time of this incident for COLLETTE, MILLER and DOES 1 through 6, inclusive, to engage in the unconstitutional conduct enumerated above, including fabricating evidence, withholding exculpatory evidence, manipulating witnesses and otherwise violating the rights of criminal suspects of Defendants. Defendants took no action to prevent this unconstitutional conduct.

SECOND AMENDED COMPLAINT FOR DAMAGES

126. Defendant COUNTY failed to adequately supervise its employees and their adherence to guaranteeing criminal defendants a fair trial; providing *Brady* material and maintaining an index of informants and information related to those informants so that such information can be provided to defendants.

127. Defendants, while acting under color of law, failed to provide reasonable security, monitoring, training and supervision of their employees, in particular of their investigators and criminologists in proper investigative techniques and the constitutional requirements for such investigations.

128. Defendants' disregard of this knowledge or failure to adequately investigate and discover and correct such acts or failures to act was a moving force which caused the violation of Mr. Bonner's constitutional rights.

129. Defendants knew, or in the exercise of reasonable care should have known, of a pattern or practice of unconstitutional violations, or the existence of facts which create the potential of unconstitutional acts, and these Defendants had a duty to train and instruct their subordinates to prevent similar acts but failed to take steps to properly train, supervise, investigate or instruct their agents or employees.

130. As a direct and proximate result of the conduct of COUNTY, CITY and DOES 7 through 10, inclusive, as described above, Mr. Bonner suffered constitutional deprivations and grievous personal injuries and damages described above.

SECOND AMENDED COMPLAINT FOR DAMAGES

131.    As a direct and proximate result of the actions of Defendant COUNTY, CITY and DOES 7 through 10, inclusive, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF 42 U.S.C. § 1983**
**Violation of Fourteenth Amendment Rights -**
**Deliberate Fabrication of Evidence**
**(Against COLLETTE, MILLER and DOES 1 through 6, inclusive)**

132.    Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

133.    COLLETTE, MILLER and DOES 1 through 6, inclusive, deliberately fabricated evidence that was used to criminally charge and prosecute Mr. Bonner.

134.    COLLETTE, MILLER and DOES 1 through 6, inclusive,  knowingly provided false information to the District Attorney's Office in an effort to obtain a conviction against Mr. Bonner for a crime that they knew he did not commit.

135.    Defendants knew that they were misrepresenting the facts of this

incident and were deliberately indifferent to the fact that their misrepresentations were relied upon during the prosecution of Mr. Bonner.

136.     The actions of COLLETTE, MILLER and DOES 1 through 6, inclusive, as Complained of herein, constituted a violation of Mr. Bonner's rights under the Fourteenth Amendment to the United States Constitution.

137.     As a direct and proximate result of the actions of Defendants, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial which is in excess of $37,000,000.00.

138.     The actions of said Defendants, and each of them, as complained of herein, were committed maliciously, oppressively and in reckless disregard of Mr. Bonner's constitutional rights, sufficient for an award of punitive / exemplary damages against all defendants and each of them, save for Defendant COUNTY and CITY, in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. §1983 *MONELL* CLAIM FOR VIOLATIONS ARISING FROM A POLICY/CUSTOM OF FAILING TO PRESERVE AND DISCLOSE EXCULPATORY EVIDENCE, FABRICATING EVIDENCE, AND FAILING TO TRAIN**
**(Against COUNTY and CITY)**

139. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

140. Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case, Defendant COUNTY, by and through the Los Angeles County District Attorney's Office, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had a) no established or clear administrative system in place, b) no stated, written or adequate policies, and c) no or inadequate training and supervisions regarding, *inter alia*, the following issues:

   a. Ensuring that any police department or police officers with which the District Attorney's Office was working provided all exculpatory evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, as numerous cases over the years made clear was its obligation.

   b. Ensuring that any police department or police officers with which the District Attorney's Office was working provided its full investigative material and that material is actually reviewed by an appropriate Deputy District Attorney ("DA.")

   c. Ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the police department or police officers with which the District Attorney's Office was working, and/or by members of its Office.

SECOND AMENDED COMPLAINT FOR DAMAGES

39

d. Ensuring that the police department or police officers with which the District Attorney's Office was working provided to the trial attorney prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense.

e. Ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense.

f. Ensuring the establishment and maintenance of an index containing information regarding the use of jailhouse informants.

g. Ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases.

h. Ensuring that the key police reports and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense.

i. Ensuring that exculpatory evidence learned or discovered after trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel.

SECOND AMENDED COMPLAINT FOR DAMAGES

40

j. Ensuring that exculpatory information known to Deputy District Attorneys would be identified, organized and maintained for production to the California Attorney General's Office for litigation in subsequent post-trial habeas and appellate proceedings.

k. Establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses.

l. Failing to discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false testimony that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused.

m. Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the DA after the preliminary hearing stage is provided to the defense.

n. Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the DA after a conviction is provided to the defense.

141. Defendant COUNTY, by and through the Los Angeles County District Attorney's Office, had the habit, custom, pattern and practice, during all or parts of

the relevant time period of:

    a. Failing to identify or disclose exculpatory evidence or false evidence, particularly regarding COLLETTE's and MILLER's conduct to withhold exculpatory evidence and to falsify evidence, as previously alleged.

    b. Entering into benefits agreements with key witnesses without disclosing them to the defense, and/or failing to identify and disclose such agreements.

    c. Improperly influencing eyewitness identifications by manipulation of witness or providing undisclosed benefits to them.

    d. Allowing known dishonest informants to provide false testimony.

    e. Failing to disclose information related to informants, including benefits provided to the informants and other impeachable information to defense counsel.

142. In 1989-1990, the Los Angeles County Grand Jury reviewed evidence that the Los Angeles County District Attorney's Office, and law enforcement throughout Southern California, were in the practice of using jailhouse informants to obtain false and fabricated confessions of criminal defendants. The pervasive use of the jailhouse informants put in doubt many of the convictions obtained by the Los Angeles County District Attorney's Office. The period of inquiry by the Grand Jury spans from approximately 1979 to 1990, although there are references to convictions as early as 1976.

143.    In its findings in the *Report of the 1989-1990 Los Angeles County Grand Jury In Its Investigation of the Involvement of Jail House Informants in the Criminal Justice System in the Los Angeles County* (hereafter "Grand Jury Report"), the Grand Jury found that the Los Angeles County District Attorney's Office failed in its responsibilities by its "deliberate and informed declination to take the action necessary to curtail the misuse of jailhouse informant testimony." This report specifically covered the time period 1979-1989, the period during which Mr. Bonner was tried and convicted. The Grand Jury noted that the "experiences and perceptions of" the informants who testified and whom it interviewed "generally reflect those of the inmate population at large." Among the statements made by the Grand Jury regarding the unreliability and deception by jailhouse informants are the following:

a.    "By definition, jail house informants have been deprived of a substantial and cherished right -- their liberty, their freedom. Because of the serious nature of the charges pending against informants, and their history of recidivism, informants often face potentially lengthy prison terms. As such, these individuals are highly motivated to curry favor with the authorities perceived to have control over their destiny. The myriad of benefits and favored treatment which are potentially available to informants are compelling incentives for them to offer testimony and also a strong motivation to fabricate, when necessary, in order to provide such testimony. This premise is a basic concept to the understanding of the jail house informant phenomena. The courts have sometimes lacked adequate factual information to fully realize the potential for untrustworthiness which is inherent in such testimony because of the strong inducements to lie or shape testimony in favor of the prosecution."

SECOND AMENDED COMPLAINT FOR DAMAGES

43

b.  "Jail house informants want some benefit in return for providing testimony. The more sophisticated may attribute their willingness to testify for law enforcement to other motives, such as their repugnance toward the particular crime charged, a family member having been a victim of a similar occurrence, the lack of remorse shown by the defendant, or other explanation to account for their assistance to law enforcement. Nevertheless, in the vast majority of cases it is a benefit, real or perceived, for the informant or some third party that motivates the cooperation."

c.  "Informants do not tend to follow norms .... This disinclination to follow societal rules extends to their willingness to defile an oath. Informants testified before the Grand Jury to repeated instances of perjury and providing false information to law enforcement. With one exception, each informant who testified claimed he himself had committed perjury or provided false information incriminating another inmate one or more times."

d.  "An appalling number of instances of perjury or other falsifications to law enforcement during the past ten years were described by informants. Undeniably, a significant number of informants do not tend to feel constrained by external or internal values to refrain from lying, regardless of the consequences to other inmates."

e.  "The informants' perception of their role is significant to the evolution and continuation of the informant system in Los Angeles County. Whether or not true, many informants believe that law enforcement officials have directly or indirectly solicited them to actively conduct themselves to secure incriminating statements from other defendants. Some informants claim that various law enforcement officials supply informants with information about crimes, in order that they (the informants) may fabricate a defendant's confession. In exchange for providing evidence for the prosecution, the informants expect significant benefits from the government. Based on this expectation, informants supply information favorable to the prosecution, often irrespective of its truth. Informants' claims concerning the pervasiveness of perjury and falsifications reflects a belief, at least among some informants, that this is how informants ply their trade. The belief that this is how the informant game is played can only encourage other informants to follow suit."

SECOND AMENDED COMPLAINT FOR DAMAGES

44

   f.  The ways that "informants claim law enforcement officials ask
       them to obtain incriminating statements from other inmates"
       include "being placed on a bus or in a hospital room with a
       defendant in a highly publicized case."

   g.  "The methods used by informants to acquire information about
       another defendant's case are numerous. The following are
       allegations made by informants concerning ways they obtain
       information on cases: Law enforcement officials assigned to a
       case, including Deputy District Attorneys, supply information on
       their case to informants."

144.   In 1972, approximately a decade prior to Mr. Bonner's arrest, the

United States Supreme Court decided *Giglio v. United States,* 405 U.S. 150, 154

(1972). In that decision, the court held that:

> "The prosecutor's office is an entity and as such it is the spokesman
> for the Government. A promise made by one attorney [to an informant
> witness] must be attributed, for these purposes, to the Government.
> [citation omitted]. To the extent this places a burden on the large
> prosecution offices, procedures and regulations can be established to
> carry that burden and to insure communication of all relevant
> information on each case to every lawyer who deals with it."

145.   Prior, during, and subsequent to the prosecution of Mr. Bonner, the

Los Angeles District Attorney's Office knew of abuses concerning jailhouse

informants, and of its own failure to record or disseminate that knowledge.

146.   In the late 1970's, prior to Mr. Bonner's arrest, two prosecutorial

agencies conducted inquiries into claims by a jailhouse informant that he knew of

improper conduct by Los Angeles County District Attorney's Office personnel

with regard to confessions allegedly made to a jailhouse informant. The record of

SECOND AMENDED COMPLAINT FOR DAMAGES

45

the informant's activities, and the conclusion of the inquires, was never indexed or widely distributed within the Los Angeles County District Attorney's Office. Subsequently, the informant surfaced repeatedly as a witness in criminal trials.

147.   Despite the mandate by the United States Supreme Court in *Giglio v. United States,* 405 U.S.150 (1972), in conjunction with the pervasive use of jailhouse informants within the County of Los Angeles, and substantial notice that false testimony by informants had occurred repeatedly within the County of Los Angeles, the Los Angeles District Attorney's Office purposefully, or with deliberate indifference to the constitutional rights of criminal defendants, failed to create any system for Deputy District Attorneys handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information.

148.   Prior to the prosecution of Mr. Bonner, the Los Angeles County District Attorney's Office knew or should have known that police officers and Deputy District Attorneys were providing case information orally and in writing to informants to make sure the informants knew the facts of the offense with which the criminal defendant was charged, and thereby knew or should have known that such informants were lying or were likely to lie in order to obtain benefits for themselves. Nonetheless, such witnesses were routinely used in prosecutions without any system of determining the truthfulness of their testimony. Alternatively, the Los Angeles County District Attorney's Office turned a blind

SECOND AMENDED COMPLAINT FOR DAMAGES

46

eye towards such information manifested a reckless disregard for, or deliberate indifference toward the truth and the rights of the accused in handling such information within its office. Subsequently, the Los Angeles County District Attorney's Office received further information regarding the regular fabrication of informant statements of jailhouse confessions, and took no action, thereby ratifying such conduct, as is elaborated in subsequent paragraphs of this complaint.

149.   Prior to the prosecution of Mr. Bonner, the Los Angeles County District Attorney's Office considered the creation of a system to track benefits provided to jailhouse informants and other impeachment information. No such system was instituted. In 1985, one Deputy District Attorney informed the Los Angeles County District Attorney's Investigative Bureau that jailhouse informant Leslie White had a reputation for unreliability, yet there was no investigation and no efforts to record or disseminate this information.

150.   In 1986, a private investigator wrote a letter to representatives of the Los Angeles County District Attorney's Office addressing the issue of jailhouse informants being supplied copies of arrest reports and given prep sessions by investigators and prosecutors to make sure that the jailhouse informants knew what defendants had supposedly confessed to. The private investigator asserted that an investigation should be conducted. He received no response.

151.   On October 9, 1986, the Head Deputy of the Torrance branch of the Los Angeles County District Attorney's Office, Peter Berman, wrote to the Chief

SECOND AMENDED COMPLAINT FOR DAMAGES

Deputy, Gilbert Garcetti, and to Director, Bureau, Branch and Area Operations, Denis K. Petty, discussing the lack of accountability and lack of accurate information concerning jailhouse informants in the Los Angles County District Attorney's Office, and the need for a standardized central index. The proposal was that, through this index, every Deputy District Attorney should be required to log basic information in a standardized manner to give other Deputy District Attorneys access to jailhouse informant information.

152. On January 27, 1987, the Management Staff of the Los Angeles County District Attorney's Office met to discuss the creation of a central index reflecting jailhouse informants. The Management Staff of the Los Angeles County District Attorney's Office decided not to create a central index for informants. The reasons given were: a) the defense bar would find out about the informant's records which would be used to impeach the informant's credibility; and b) the Management Staff suspected that deputies from the Los Angeles County Sheriff's Department intentionally put jailhouse informants in jail cells with defendants from where law enforcement could use a confession. The Management Staff believed that deputies from the Los Angeles County Sheriff's Department would be charged with knowledge of the information in centralized records and, therefore, the future conduct of the jailhouse informant in obtaining confessions would be construed as possibly violating *Massiah v. United States,* 377 U.S. 201 (1964).

SECOND AMENDED COMPLAINT FOR DAMAGES
48

153.   On October 24, 1988, informant Leslie White publicly demonstrated the methods jailhouse informants used to discover case information and to fabricate suspects' confessions.

154.   On November 17, 1988, Chief Deputy District Attorney Gregory Thompson disseminated an order to all Criminal Deputy District Attorneys entitled Special Directive 88-14 stating:

> "We must eliminate from the People's case the risk of perjured testimony by a jailhouse informant. That threat is most acute when the indication of the informant's reliability is solely that "he relates facts which are known to law enforcement, but could not otherwise be known by him." That factor of reliability has been shown not to be dependable in all cases ... This office will no longer call as a witness a jailhouse informant to testify to a defendant's oral statement, admission or confession without concrete evidence of the truthfulness of the informant. Even then, prior approval by the appropriate Bureau Director must be obtained."

155.   On June 1, 1989, Chief Deputy District Attorney Gregory Thompson disseminated another order to all Criminal Deputy District Attorneys entitled Special Directive 89-05 outlining the responsibilities of Deputy District Attorneys Regarding jailhouse informants. In that order, Chief Deputy Thompson states that the Los Angeles County District Attorney will establish a central jailhouse index to be maintained in the Bureau of Special Operations. This Central Index is available and indeed must be consulted by any attorney who wants to use a jailhouse informant as a witness.

156.   Much of the foregoing information was contained (at times in less detail) in the Grand Jury Report. Other conclusions of the Grand Jury Report

SECOND AMENDED COMPLAINT FOR DAMAGES

49

regarding the policy and practices of the Los Angeles District Attorney's Office

include:

   a. "Very little effort was expended by the District Attorney's Office to investigate the background and motivation of most jail house informants in order to assess their credibility prior to presenting them in court as witnesses."

   b. The DA's Office had no central index indicating other cases in which a jailhouse informant had testified, or the benefits received for testimony.

   c. The lack of proper controls and supervision regarding informant benefits, and the inadequate disclosure of benefits or expected benefits raised "grave concerns."

   d. The "circumstances regarding benefit and the expectations of benefits, in many cases, [were] not adequately presented to the judge or jury for them to have the necessary factual basis to evaluate the testimony of the informant."

   e. "[I]nformants had their offenses reduced from felonies to misdemeanors, received probationary sentences, received county jail sentences instead of state prison, avoided parole violations, and received releases without bail on their ... Modifications of sentences and reductions in sentences ranged from days, to months, to years following their testimony on behalf of the prosecution."

   f. "The practice of waiting until after the testimony is provided, before the informant's pending case is dealt with, may lend itself to some troubling results. This may provide the informant with a basis for assuming that his sentence will be measured by the assistance he provides the prosecution by his testimony. In view of the benefits that he may be seeking by his testimony, the potential for perjury or shading of testimony for the prosecution must be recognized. When the cooperating informant is told that it will be reported in his favor if he gives "truthful" testimony, it is only reasonable that "truthful" to the informant means consistent with the prosecution's theory of the case. Otherwise, of course, there is

SECOND AMENDED COMPLAINT FOR DAMAGES

50

no point in calling the informant as a witness, such an incentive to provide testimony may have a significant influence on the integrity of the fact-finding process."

g.  In the late 1970's, a jailhouse informant notified the District Attorney's Office that he knew of misconduct by members of the DA's Office, which misconduct was never verified. Although it was concluded that the informant had lied in his testimony, no record of that conclusion was indexed or distributed, and the informant "surfaced repeatedly as a witness in criminal litigation."

h.  In 1980, a DA administrator saw letters from an informant to the administrator's predecessor advising that he and another informant had provided false testimony. The matter was referred to the Attorney General's Office, which found the claims not credible.

i.  Five years before the Grand Jury Report, the informant described in ¶j, infra (describing how the informant revealed to the LASD how he obtained false confession information), a Deputy DA relayed to members of the DA's investigative bureau that the informant had a reputation for not being reliable, but there was no investigation.

j.  In October 1986, a private investigator wrote a letter to the DA's Office alleging that jailhouse informants were being "supplied copies or arrest reports and given 'prep' sessions by investigators or prosecutors to make sure the informants [knew] what the defendant [had] supposedly confessed to." *[Id.]* The investigator claimed he received no response from the District Attorney's Office. "No District Attorney witnesses were able to account for what happened with the letter and why no inquiry was made regarding the allegations."

k.  In March 1987, the first in a series of articles regarding jailhouse informants was published. These articles exposed the use of fabricated jailhouse confessions, the planting of informants with instructions to elicit confessions, and the feeding of information to informants. The DA's Office contacted the reporter claiming that Deputy DAs were disputing the accuracy of the reporting, in response to which the reported was able to provide documentation. "District Attorney witnesses questioned about the articles [by the

SECOND AMENDED COMPLAINT FOR DAMAGES
51

Grand Jury] could provide no explanation as to why a further inquiry into the published allegations wasn't conducted."

l.  A deputy DA who had previously been a criminal defense lawyer and encountered the use of a jailhouse informant confession that she believed must have been false, raised concerns within the office about the ongoing use of this informant. She proposed a central index in general, and specifically proposed dissemination of information about this one informant, whom she believed to be an acknowledged liar. Toward the end of 1987 or early 1988, another Deputy DA discussed the problem with an administrator, and was told that administration was on top of the situation. There were numerous indicators from multiple sources of the unreliability of this particular informant.

m.  There were cases in which judges made findings about the lack of credibility of particular informants. No record of such conclusions was maintained or disseminated within the DA's Office.

n.  One Deputy DA received a letter from another Deputy DA warning of the use of a particular informant. The receiving Deputy sent a letter to the defense advising it of the letter, and indicating that he intended to use the informant anyway and did not intend to investigate the matter further (although the informant was ultimately not used.)

o.  In one case from late 1985, the Grand Jury noted that informants claimed to have incriminating information. The Deputy DA on the case indicated that he knew informants had ways of obtaining information while in jail.

p.  In one case with multiple informants, an informant who was rejected by the prosecutor because had had received money for information from detectives became a defense witness and testified how informants get information from suspects and trade it for favors with the DA's Office. The Deputy DA did not follow up these claims.

q.  Another Deputy DA received information about false statements by jailhouse informants and put the information in a memo to a DA administrator. She received no reply. (The receiving administrator

testified he never saw the memo, which could have been sent to the case file or filed with other paperwork.)

r.   By January 1987, senior management of the LA District Attorney's Office was cognizant of a concern within the office that a central repository of informant information should be established.

157.   After the 1972 *Giglio* decision, the Los Angeles County District Attorney's Office had a duty to create a system in which information pertaining to jailhouse informants would be disseminated to the Deputy District Attorneys representing the County during Mr. Bonner's preliminary hearing and trial. Based on the administrative actions by the County of Los Angeles District Attorney's office, Deputy District Attorneys, including the Deputy District Attorneys on Mr. Bonner's case, did not have access to any impeachment information, including benefits provided to "Mr. Hayes" (or Mr. Hayes' actual name) prior to Mr. Bonner's conviction.

158.   Based on the Los Angeles County District Attorney's Office's failure to create a system in which information pertaining to jailhouse informants would be shared among Deputy District Attorneys, the routine use of jailhouse informants to obtain convictions, the routine falsification of such testimony, and the numerous instances in which the issue of such falsification was brought to the attention of members of the District Attorney's Office, Deputy District Attorneys for Defendant Los Angeles County, the Los Angeles District Attorney's Office and Defendant Los Angeles County had a pattern, practice, and custom rising to the level of

SECOND AMENDED COMPLAINT FOR DAMAGES

policy of presenting as credible witnesses jailhouse informants whose testimony they knew or should have known was likely false, and of permitting jailhouse informants to testify falsely at trial that they were receiving little or no benefits for their testimony when, in truth and fact, these informants were receiving extensive benefits for their testimony. Alternatively, the Los Angeles County District Attorney's Office turned a blind eye toward such information and manifested a reckless disregard for, or deliberate indifference toward the truth and the rights of the accused in presenting such jailhouse informants as credible witnesses whose testimony should be credited.

159.    Based on the Los Angeles County District Attorney's Office's failure to create a system in which information pertaining to jailhouse informants would be shared among Deputy District Attorneys, the routine use of jailhouse informants to obtain convictions, and the routine falsification of such testimony, Deputy District Attorneys for Defendant Los Angeles County, Defendant Los Angeles County District Attorney's Office and Defendant Los Angeles County had a pattern and practice of using unreliable testimony of jailhouse informants to secure criminal convictions, knowing that· such testimony was false or made in reckless disregard to the truth (including reckless disregard to the potential or likely falsity of the informant's testimony).

160. The customs, policies, practices, failures, actions and inactions of the

Los Angeles County District Attorney's Office elaborated above were or should have been known to the policy makers responsible for the Los Angeles County District Attorney's Office and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Los Angeles District Attorney's Office and its policy makers were on notice of these deficiencies and failures.

161.   During the time period at issue in this lawsuit, the Los Angeles District Attorney's Office had no established or clear policy regarding the following issues pertaining to informants: a) maintaining files and information regarding jailhouse informants, and benefits offered to or received by jailhouse informants; b) ensuring that information regarding benefits offered to or received by jailhouse informants was provided to the individual prosecutor(s) in the case(s) in which the informant was to testify; c) fully and completely documenting all law enforcement and prosecutorial interactions with jailhouse informants; d) ensuring that the information and testimony provided by jailhouse informants was reliable and truthful; e) ensuring that, whether through inadvertence or design, representatives of the State, including law enforcement and prosecutors, did not provide information to jailhouse informants in a manner that suggested the

SECOND AMENDED COMPLAINT FOR DAMAGES
55

provision of answers for which they were looking; f) disciplining employees involved in dishonesty or otherwise abusing their authority; g) investigating incidents involving the misuse of, or presentation of false evidence by, jailhouse informants or other misconduct involving false evidence; and h) supervising personnel in the provision of jailhouse informant benefit and other relevant information to the defendant(s) in the case(s) in which the informant was to testify.

162. To the extent that the Los Angeles District Attorney's Office had policies regarding the issues set out in the foregoing paragraph, the policies were not consistently known to, or implemented by, line prosecutors in cases in which an informant received benefits and testified in a case.

163.   During the time period at issue in this lawsuit, the Los Angeles District Attorney's Office had a custom and practice of a) not maintaining files and information regarding jailhouse informants, and benefits offered to or received by jailhouse informants; b) failing to ensure that information regarding benefits offered to or received by jailhouse informants was provided to the defendant(s) in the case(s) in which the informant was to testify; c) not fully and completely documenting all law enforcement and prosecutorial interactions with jailhouse informants; d) failing to ensure that the information and testimony provided by jailhouse informants was reliable and truthful; e) failing to ensure that, whether through inadvertence or design, representatives of the State, including law enforcement and prosecutors, did not provide information to jailhouse informants

SECOND AMENDED COMPLAINT FOR DAMAGES

56

in a manner that suggested the provision of answers for which they were looking; f) failing to discipline personnel involved in dishonesty, specifically in enabling, encouraging, condoning or presenting false jailhouse informant testimony that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused; g) failing to investigate incidents involving the misuse of, or presentation of false evidence by, jailhouse informants or other misconduct by its personnel; h) condoning and encouraging the fabrication of evidence, including but not limited to the presentation of materially false investigative reports, the use of perjurious jailhouse informants, and/or the use of false statements in their prosecutions; i) presenting and relying on false evidence against defendants without disclosing the falsity of the evidence; and, j) failing to properly or adequately supervise personnel in the provision of informant benefit and other relevant information to the defendant(s) in the case(s) in which the informant was to testify.

164.   The policies, practices and customs set forth above meant that certain exculpatory, material information either did not reach the prosecutors handling the cases regarding which the information was exculpatory, or such information was withheld by the prosecutors, and did not reach the defendants who needed the information in order to defend themselves, thereby depriving them of a fair trial. It was foreseeable that such policies, practices and customs would result in the deprivation of a fair trial, including specifically in Mr. Bonner's case. Such

policies, practices and customs were a moving force or the moving force resulting in the deprivation of a fair trial to Mr. Bonner, thereby violating his rights under the Due Process Clause of the United States Constitution.

165. As a direct and proximate result of Defendant COUNTY's acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of district attorney's acts and omissions alleged above, Mr. Bonner sustained injury and damage to be proved at trial.

166.   As a direct and proximate result of the actions of Defendant COUNTY as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $37,000,000.00.

167. Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case, Defendant CITY, by and through the Long Beach Police Department, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had a) no established or clear administrative system in place, b) no stated, written or adequate policies, and c) no or inadequate training and supervisions regarding, *inter alia*, the following issues:

SECOND AMENDED COMPLAINT FOR DAMAGES

a. Ensuring that police department officers provided all exculpatory evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, as numerous cases over the years made clear was its obligation.

b. Ensuring that police officers provide its full investigative material and that material is actually reviewed by an appropriate Deputy DA.

c. Ensuring that exculpatory evidence was not buried in files provided to the district attorney's office handling the case.

d. Ensuring that police officers provided to the district attorney's full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense.

e. Ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense.

f. Ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases.

g. Ensuring that the key police reports and other key case documents

SECOND AMENDED COMPLAINT FOR DAMAGES

provided full and complete descriptions of witness interactions and called

attention to any irregularities, deviations from policy or evidence favorable

to the defense.

h. Ensuring that exculpatory evidence learned or discovered after

trial and conviction (including between trial and sentencing and after

sentencing) was disclosed to the district attorney's office.

i. Failing to discipline personnel involved in dishonesty, particularly

in enabling, encouraging, condoning or presenting false testimony that was

known or should have been known to be false or that was utilized with a

reckless disregard for, or deliberate indifference towards, the truth and the

rights of the accused.

j. Establishing procedures so all exculpatory/impeachment evidence

discovered by law enforcement after the preliminary hearing stage is

provided to the defense.

168. Defendant CITY, by and through the Long Beach Police Department,

had the habit, custom, pattern and practice, during all or parts of the relevant time

period of:

a. Failing to identify or disclose exculpatory evidence or false

evidence, particularly regarding COLLETTE's and MILLER's conduct to

withhold exculpatory evidence and to falsify evidence, as previously alleged.

b. Entering into benefits agreements with key witnesses without

SECOND AMENDED COMPLAINT FOR DAMAGES

60

disclosing them to the district attorney's office, and/or failing to identify and disclose such agreements.

c. Improperly influencing or manipulation of witness or providing undisclosed benefits to them.

d. Knowingly providing false information to the district attorney's office.

169. The customs, policies, practices, failures, actions and inactions of CITY elaborated above were or should have been known to the policy makers responsible for the Long Beach Police Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Long Beach Police Department and its policy makers were on notice of these deficiencies and failures.

170. The customs, policies, practices, failures, actions and inactions of the Long Beach Police Department elaborated above were so closely related to the deprivation of Mr. Bonner's rights as to be a moving force that caused the constitutional violations alleged herein.

171. Defendants, acting individually and in concert with each other and/or

SECOND AMENDED COMPLAINT FOR DAMAGES

others not named herein, fabricated false evidence, suppressed or destroyed exculpatory evidence, failed to investigate in a manner that shocks the conscience, and instead followed through with the unlawful prosecution of Mr. Bonner, thereby violating Mr. Bonner's right not to be deprived of liberty without due process of law.

172. The false evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports, documents, and testimony prepared or given in connection with the investigation of the Polk murder.

173. Defendants' misconduct, acting individually and/or in concert with others not named herein, further includes but is not limited to reckless investigatory misconduct.

174. Each Defendant knew or should have known the evidence was false, and the Defendants' conduct was intentional and knowing, or alternatively done with deliberate indifference to and/or reckless disregard for Plaintiff's rights or for the truth.

175. Defendants' misconduct did not cease with Mr. Bonner's conviction but continued through his exoneration, thereby prolonging his wrongful incarceration.

176. The constitutional source against using false evidence and *Brady* violations is primarily the due process clause of the Fifth and Fourteenth

SECOND AMENDED COMPLAINT FOR DAMAGES
62

Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to not have false evidence used against him and *Brady* violations are any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

177. Defendants were each jointly and severally responsible to not use false evidence against Mr. Bonner. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

178. As a direct and proximate result of Defendants' actions, Mr. Bonner was wrongly arrested, detained, prosecuted, convicted, and incarcerated for nearly 37 years and suffered other grievous injuries and damages set forth above.

179.   As a direct and proximate result of the actions of Defendants as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

SECOND AMENDED COMPLAINT FOR DAMAGES

# EIGHTH CAUSE OF ACTION
## CLAIM UNDER CALIFORNIA CODE § 815.2 FOR RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY INCLUDING FOR NEGLIGENT SUPERVISION AND TRAINING
### (Against COUNTY)

180. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

181. California state law provides that public entities are directed to pay any tort judgment for any claim or action against an employee of the public entity for an injury arising out of an act or omission occurring within the scope of his or her employment.

182. Defendants are or were employees of COUNTY and/or CITY, and acted within the scope of their employment in committing the acts and omissions described herein.

183. Supervisory Defendants named herein, and other supervisory personnel whose identities are not currently known, failed to properly supervise and train employees in (a) ensuring that exculpatory evidence is provided and disclosed to those facing criminal charges, (b) in ensuring that false evidence is not used in any investigation or prosecution, (c) in maintaining a database of jailhouse informants and the benefits provided to said informants, and (d) otherwise complying with their responsibilities. Defendants COUNTY and CITY have respondeat superior liability for all such failures to supervise and train.

184. Defendants COUNTY and CITY are legally obligated to pay any judgment entered against their employees acting within the course and scope of their employment.

185.   As a direct and proximate result of the actions of Defendants as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $74,000,000.00.

## NINTH CAUSE OF ACTION
### CALIFORNIA GOVERNMENT CODE 835.4 ARTICLE 2 CLAIM
### (Against COUNTY)

186. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

187. Through its policies, practices, and procedures and failures to supervise and train its employees, COUNTY created a dangerous condition for its residents, including the dangerous condition where innocent residents like Mr. Bonner were subject to unlawful and unconstitutional investigations, resulting in wrongful convictions and wrongful life sentences, the deprivation of liberty, violations of their civil rights, and physical and mental harm, including bodily injuries sustained where innocent people were locked up with people who wanted to and did cause them harm.

SECOND AMENDED COMPLAINT FOR DAMAGES
65

188. COUNTY is liable for the injuries sustained by Mr. Bonner because they were injuries that were reasonably foreseeable as a result of dangerous conditions that COUNTY created through its negligence and mismanagement of its jailhouse informant database, or lack thereof.

189. COUNTY is also liable for the injuries sustained by Mr. Bonner because the injuries were the result of a dangerous condition created by the negligent or wrongful acts or omissions of employees of COUNTY cting within the scope of their employment.

190. COUNTY breached its affirmative duty to protect Mr. Bonner from the conduct of its employees which actually and proximately caused Mr. Bonner's injuries and damages.

191.   As a direct and proximate result of the actions of Defendants, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured, and endured great physical, mental and emotional pain and suffering; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, in excess of $37,000,000.00.

## TENTH CAUSE OF ACTION
**Negligence**
**Under California State Law**
**(Against COUNTY)**

192.  Plaintiff realleges all the foregoing and any subsequent paragraphs

SECOND AMENDED COMPLAINT FOR DAMAGES

contained in the complaint, as if fully set forth herein.

193.   The actions committed by Defendants COUNTY as complained of herein, as described above, also constituted a breach of defendants' duty to use due care toward Plaintiff.

194.   As a direct and proximate result of the actions committed by Defendants DOES 1 through 6, inclusive, as complained of herein, Plaintiff: 1) was substantially physically, mentally and emotionally injured; 2) incurred medical and psychological costs, bills and expenses and 3) incurred other special and general damages and expenses in an amount to be proven at trial, which is in excess of $74,000,000.00.

**WHEREFORE**, plaintiff prays for judgment as follows:

a) For a judgment against all defendants for compensatory damages in an amount in excess of $74,000,000.00;
b) Treble damages;
c) For a judgment against all defendants, save defendants COUNTY and CITY, for punitive damages in an amount to be determined by a jury;
d) For an award of reasonable attorney's fees and costs;
e) For a trial by jury; and
f) For such other and further relief as this honorable court deems just and equitable.

_/S/ Gregory Peacock_____
GREGORY PEACOCK

SECOND AMENDED COMPLAINT FOR DAMAGES
67